UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KAREN GRAHAM,

                         Plaintiff,              Civil Action No. 18-11928

v.                                    David R. Grand
                                        United States Magistrate Judge[1]

CITY OF DETROIT, *et al.*,

                         Defendants.
_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 33)

This is an employment discrimination action brought by plaintiff Karen Graham ("Graham") against her former employer, the City of Detroit, and two of its employees, Amy Sovereign and Mike Homant (collectively "Defendants"). In her complaint, Graham asserts claims for race, sex, and age discrimination. (ECF No. 1).

On June 15, 2021, Defendants filed a motion for summary judgment. (ECF No. 33). On August 30, 2021, Graham timely responded to Defendants' motion (ECF No. 35), and on September 13, 2021, Defendants filed a reply (ECF No. 36). The Court heard oral argument on Defendants' motion on November 8, 2021. The Court then referred the case for a settlement conference, but unfortunately a settlement was not reached.

For the reasons set forth below, the Court will grant Defendants' motion for

_____

[1] The parties have consented to the undersigned exercising jurisdiction over all proceedings in this civil action pursuant to 28 U.S.C. § 636(c)(1). (ECF No. 19).

summary judgment.

### A.    Factual Background

#### 1.    *Graham's Employment History*

Graham is an African-American woman, who was born in 1962.  (ECF No. 33-7, PageID.390).    She was employed by the City of Detroit ("City") for a total of approximately twenty-two years, holding various Information Technology ("IT") positions from 1995 to 2016.  (ECF No. 1, PageID.5).  From 2014 to 2016, Graham held positions as an IT Manager and Applications Analyst within the City's Water and Sewage Department.  On or about August 1, 2016, Graham was promoted to the position of Project Manager IV in the City's Department of Innovation and Technology ("DoIT"), the position at the heart of this litigation.

#### 2.    *Graham is Promoted to a Project Manager Position*

In 2016, DoIT established the Program Management Office ("PMO"), which was responsible for project management of the City's IT projects.  (ECF No. 33-3, PageID.263-64).  The PMO was budgeted for four Project Manager IV positions.  (*Id.*, PageID.296).  Graham applied for one of these positions, the specific duties of which were spelled out in a Position Description.  (ECF No. 33-5).

Graham interviewed for the Project Manager position before a three-person panel, which included Defendant Amy Sovereign ("Sovereign"), the PMO's Program Management Officer.  (ECF No. 33-3, PageID.272).  Sovereign, a Caucasian woman, extended Graham a conditional offer of employment as a Project Manager IV on June 7, 2016.  (ECF No. 33-6).  Graham's employment in her new role was subject to a six-month

probatory period.  (ECF No. 33-3, PageID.285; ECF No. 33-7, PageID.430).  Graham accepted the offer and began her role as a Project Manager on August 1, 2016, reporting directly to Sovereign.  Graham was 54 years old when she was hired into his position. (ECF No. 33-7, PageID.492).

Within the PMO, Graham joined Carl Garrett, another Project Manager who also was interviewed and hired by Sovereign.  (ECF No. 33-3, PageID.292).  Garrett, an African-American male, was 59 years old at the time of his hire into this position.  (ECF No. 33-8, PageID.608).  In April or May 2017, Sovereign hired Brad Wintersteen, a Caucasian male, to fill one of the two still-vacant Project Manager positions.  (ECF No. 33-3, PageID.295-96).  Wintersteen did not begin working in this role until July 2017, however, as he had a previously-scheduled trip out of the country.  (*Id.*, PageID.344).

### 3.    Graham's Work Performance During Her Initial Probationary Period

According to Defendants, Graham "displayed numerous work performance deficiencies over the course of her probationary period."  (ECF No. 33, PageID.185). During this time, Sovereign documented Graham's performance problems, including her difficulty preparing coherent meeting agendas, facilitating meetings, creating meeting summaries, and communicating regarding ongoing projects.[2]  (ECF 33-9; ECF 33-3,

---

[2] Sovereign also noted on multiple occasions that Graham had ongoing difficulty using the City's online-based collaboration and project management tool known as "Smartsheet." (ECF No. 33-3, PageID.346-49).  Well into her six-month probationary period, Graham requested Sovereign's assistance with basic Smartsheet user functions, such as how to "view" versus "edit," which made clear to Sovereign that Graham was not utilizing the provided Smartsheet tutorials.  (*Id.*).  And, despite the fact that Sovereign repeatedly informed Graham that project documentation should be stored in Smartsheet, Graham continued to use Excel; on at least one occasion, Graham's use of Excel resulted in her producing multiple inaccurate versions of a site visit schedule that customers

PageID.286).  Sovereign testified that she discussed Graham's performance deficiencies with her "constantly" and "in excruciating detail," and she attempted to support Graham by reviewing her written assignments and providing constructive feedback.  (ECF No. 33-3, PageID.309-10, 315, 317).

In February 2017, Graham received her six-month written probation evaluation from Sovereign.  (ECF No. 33-10).  In this evaluation, Sovereign rated Graham in several performance-based areas, concluding that although she met or exceeded expectations in the majority of categories, such as "Professionalism & Credibility," "Technology Applications," "Teamwork," "Interpersonal Skills," and "Dependability and Reliability," she needed improvement in the "Business Writing" and "Technical Knowledge" categories.  (*Id.*).  Sovereign provided a detailed written explanation of her rationale for the ratings in the section of the evaluation labeled "Opportunities for Improvement."  (*Id.*, PageID.628).  There, Sovereign noted, "[s]pecific areas of focus for improvement are: Project Management, Meeting Facilitation, Meeting Planning/Effectiveness, Change Management, Project Documentation, Project Plans, etc."  (*Id.*).  Sovereign went on to explain, "[Graham] needs to feel more empowered in her role to hold people to deadlines, even when this applies to our internal resources.  We will discuss strategies to empower her to keep meetings on track and keep people on task. … [Graham] needs a bit more time to increase her capabilities related to the Smartsheet application.  The PMO is often looked to as the 'subject matter experts' of Smartsheet so it is important we all have a thorough

---

were expected to cross-reference.  (*Id.*, PageID.347-48).

understanding of the application and its many features and functions." (*Id.*).

When questioned at her deposition about this initial, somewhat favorable evaluation of Graham, Sovereign testified that, although Graham was having "a lot of challenges[,]" she wanted to use the evaluation to encourage Graham, to "raise her up," and to give her an evaluation reflective of her efforts. (ECF No. 33-3, PageID.286, 314).

Per City policy, Sovereign had three options upon completing Graham's initial probationary evaluation: grant Graham permanent status, extend Graham's probation, or terminate Graham's employment. Sovereign chose to extend Graham's probation for an additional six months. (ECF No. 33-10). Sovereign testified that she extended Graham's probation because Graham was not as successful as Sovereign had hoped, and she wanted to provide Graham with more time and opportunity to make the critical improvements necessary to succeed in the position. (ECF No. 33-3, PageID.314, 345-46). Specifically, Sovereign explained, "that's what the probationary period is for, and why we have the option to extend it. I wanted to give her more time to see if she could make the needed improvements." (*Id.*, PageID.346).

### 4.    The ASE Project and Defendant Mike Homant

As a Project Manager, Graham was assigned to manage the Advanced Switch Ethernet ("ASE") project, which involved the rollout of new AT&T circuits across approximately 100 sites. (*Id.*, PageID.281-82; ECF No. 33-13, PageID.659). DoIT's Director of Enterprise Technologies, Defendant Mike Homant ("Homant"), a Caucasian male, was the executive sponsor of this project. (ECF No. 33-13, PageID.666). The executive sponsor initiates the project and agrees to its scope, but is "hands-off" thereafter,

with the exception of receiving periodic updates and status reports. (*Id.*; ECF No. 33-3, PageID.288). Thus, Homant did not supervise, or even work directly with Graham on the ASE project. (ECF No. 33, PageID.654, 662; ECF No. 33-3, PageID.351). One of Homant's direct reports was Robert Millender ("Millender"), who worked with Graham, but also did not supervise her. (*Id.*; ECF No. 35, PageID.811). At all relevant times, Graham reportedly directly to Sovereign with respect to the ASE project. (ECF No. 33-3, PageID.263-64, 351).

Graham continued to exhibit performance problems throughout the ASE project. For example, Homant testified that Millender informed him of several deficiencies involving Graham's interaction with AT&T regarding circuit disconnects, proper scheduling of dates, and effective coordination of project resources. (ECF No. 33-13, PageID.664-66, 675-76). While Homant did not address these performance deficiencies directly with Graham, because he was not her supervisor, he did inform Sovereign of his concerns with Graham's performance.[3] (*Id.*, PageID.666, 676, 683-84).

Sovereign testified that, throughout Graham's second probationary period, she continued to provide Graham with training and assistance. (ECF No. 33-3, PageID.310, 315, 317). According to Sovereign, however, the quality of Graham's work did not improve. (*Id.*, PageID.315-16). Indeed, Graham's work performance deficiencies

---

[3] In one particular instance, Homant had requested a report from Graham that would allow him to track various data components of the project, but the report was not being properly updated. (ECF No. 33-3, PageID.288-89; ECF No. 33-13, PageID.663). Homant informed Sovereign that the data he requested was not being provided by Graham, and Sovereign had to intervene. (ECF No. 33-3, PageID.289; ECF No. 33-15).

continued to the point that, on May 24, 2017, Sovereign emailed Graham, stating, "**Karen, This is getting really embarrassing**" with respect to Graham's failure to properly communicate with team members to schedule site visits for a project.[4]  (ECF No. 33-11) (emphasis added).

### 5.   Graham's Employment with the City is Terminated

According to Defendants, Graham's ongoing performance problems made her continued employment as a Project Manager untenable.  Sovereign testified that she was constantly redoing Graham's work and was essentially doing both her own and Graham's jobs. (ECF No. 33-3, PageID.327).  Sovereign also testified that the decision to terminate Graham's employment was hers alone.  (*Id.*, PageID.333-34).  Although Sovereign determined as early as May 31, 2017, "not to pass [Graham] on her probation," Graham, without knowing of this decision, continued working within the department while Sovereign explored other internal options for her.  Despite Graham's performance deficiencies, it was still very difficult for Sovereign to make the decision to terminate Graham's employment, and she communicated with Raquiba Dismuke, a Human Resources representative, to determine whether Graham could be transferred to her former

---

[4] In short, a series of ten radio tower installations needed to be accomplished at ten different locations, with a start time of 9:00 a.m.  (ECF No. 33-11).  But, rather than scheduling them by designating one initial site starting at 9:00 a.m. and the rest "TBD" based on how the day(s) went, Graham set them all for 9:00 a.m.  (*Id.*).  When a Police Sergeant wrote back, "we need to know which site to be at first," Graham responded, "We begin @ 9:00 a.m., and next location is decided by the team on site . . ." (*Id.*).  Not surprisingly, this led the Sergeant to again ask, "What site are we meeting at on Thursday at 9am[?]" (*Id.*).  The Sergeant also noted that Graham had referenced only nine sites rather than ten.  (*Id.*).  Perhaps most significantly – because it was an issue Graham was to have been working on following her February 2017 probation evaluation – Sovereign noted in her end-of-the-chain email to Graham, "use of Smartsheet would have eliminated all of the various versions of this [scheduling] document." (*Id.*).

position in the Water and Sewage Department (or a different position); unfortunately, Sovereign was informed that this was not possible. (*Id.*, PageID.329; ECF No. 33-16; ECF No. 33-17).

On July 5, 2017, Sovereign met with Graham and provided her with a second written probation evaluation, in which she was evaluated on the same work performance competencies as her first evaluation. (ECF No. 33-12). This time, Sovereign rated Graham as "unsatisfactory" or "needs improvement" in the majority of the areas considered. Sovereign also addressed Graham's performance deficiencies in the following detailed written explanation:

### Initiative and Self-Management

[Graham] has not shown improvement in independently meeting the expectations [of] project sponsors. I have been called on to intervene on all of her projects with the exception of the Lean Project. Complaints from project sponsors and team members are related to communication failures and omissions, disorganized meetings as well as lack of required documentation. Unfortunately, the projects our team are required to lead are complex, large scale projects and at this point we do not feel confident that [Graham] could independently lead such projects.

### Business Writing

* * *

UPDATE 7/1/17. There has been no marked improvement with regard to this area. Lack of good project documentation on her main project has led directly to a financial loss for the City of Detroit. . . . Written and verbal assistance has been provided numerous times but there have not been notable improvements . . .

### Technology Application

[Graham] needs a bit more time to increase her capabilities related to the Smartsheet application. The [Program Management Office] is

often looked to as the 'subject matter experts' of Smartsheet so it is important we all have a thorough understanding of the application and its many features and functions.[5]

UPDATE 7/1/17.  [Graham] has not taken the initiative to gain expertise with Smartsheet and only uses Smartsheet when explicitly asked to do so.  [Graham] has not demonstrated an understanding of how Smartsheet can be used to keep project team members and stakeholders on the same page.   Use of Smartsheet would have prevented one customer complaint from a Police Sergeant wherein he ended up having to ask for several clarifications on the project schedule, yielding at least 12 e-mails and multiple documents that should have been accessible to the entire team on Smartsheet.  We discussed at the beginning of her employment that help was desperately needed in this area and that assistance with administering/training Smartsheet would be needed as immediately as possible.   After 11 months, no initiative has been taken to gain expertise or assist the [Program Management Office] in this regard.

### Critical and Analytical Thinking

There have been many times when a fundamental lack of understanding of project management and coordination requirements were evident.  Four complaints from project sponsors and/or team members involved communication, another involved failure to properly document a project schedule, one complaint regarding a exclusion of required team members on meeting notices and I was copied on numerous email chains that spiraled out of control due to vague communication and an unwillingness to initiate a phone conversation in lieu of multiple emails.

One example of an incident is that a report was requested on 5/26/17, due 6/2/17 to document critical project data points.  As of 6/20/17, after several attempts and a meeting with the team and project sponsor to further explain what was needed, sponsor still did not have a report that meets the requirements of the project.  [Graham] sent him another attempt on 6/15/17, which sponsor sent back to me as it was still not accurate, not in a clear format no in Smartsheet as requested.  No evidence that any follow up was done with sponsor other than sending the report via email.  This project is another example of one that

---

[5] The Court notes that this same verbiage appeared in Graham's first probation evaluation, but under the "Technical Knowledge" heading.  Regardless of the heading, the "update" that follows clearly relates to the same subject matter – Graham's capabilities with the Smartsheet application.

required lots of intervention from the project sponsor.  Another example on 5/30/17 when DPD Commander was confused about a vendor site visit due to an email that was apparently forwarded without proper explanation and although I was listed on [Graham's] out-of-the-office email as the escalation person, I had been provided no information about the visit or what could potentially be asked in her absence.  It is of utmost importance that Project Managers analyze risks and mitigate them and this was unfortunately not done in this situation and resulted in a lot of unnecessary communication and a very unhappy Precinct Commander.

**Technical Knowledge**

* * *

[Graham] has had trouble with project management basics including organizing and leading meetings, creating project plans and schedules, documentation and communication.  The job description for this position includes the following, none of which have been areas of success for [Graham].  1  Conveys goals and objectives clearly and in a compelling manner; listens effectively and clarifies information as needed, interprets verbal and non-verbal messages that others communicate; produces clear status reports.  2  Pro-actively engages present and future stakeholders in design, priority setting, and implementation.  3  Ensures a high level of fiscal control and accountability for project budget.  4  Creates work standards for project, establishes and defines roles and responsibilities, specific outcomes, and clear measures for quality and success of the team.  5  Prioritizes work for self and subordinates.  6  Anticipates consequences of actions, potential problems, or opportunities for change.  We have had issues related to project reporting, project schedules and communication with team members and supporting members . . .  This position is an advanced, high level position that requires strong project management and communication skills and, unfortunately, [Graham] has not been able to provide DoIT what we need form [sic] this position.

(2/1/17)  Please document all completed training within the Smartsheet titled, "Professional Development Resources"  UPDATE 7/1/17.  As of July 3, 2017, [Graham] has completed only 5 of the 21 (24%) of the professional development materials that she was asked to complete during her review on February 1, 2017.  This does not demonstrate a willingness to improve, even though we discussed that improvements were needed when her probation was extended.

(*Id.*, PageID.628) (footnote added).

At this time, Sovereign informed Graham that her employment with the City would be terminated.  (ECF No. 33-3, PageID.316-17).

In her deposition, Sovereign testified that her decision to terminate Graham's employment was not based on Graham's race, sex, or age, nor influenced by others.  (*Id.*, PageID.334, 351).  Homant confirmed that he did not try to convince Sovereign to terminate Graham's employment with the City, nor did he have direct involvement in that decision-making process.  (ECF No. 33-13, PageID.696, 706).  Graham admitted that she has no evidence to the contrary, and that at most Sovereign had told her that Homant had complained about Graham not "following up."  (ECF No. 33-7, PageID.452-53).

### 6.   *The Instant Lawsuit*

On June 18, 2018, Graham filed her complaint in the instant action, alleging race, age, and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101, *et seq.*[6]  (ECF No. 1).  Defendants now move for summary judgment, arguing that there is no genuine issue of material fact as to any of Graham's claims.  While the Court is sympathetic to Graham, as an employee with many years' service to the City of Detroit, for the reasons set forth below, because Graham failed to raise a material question of fact

---

[6] Graham also brought a claim for race discrimination pursuant to 42 U.S.C. § 1981, as well as for creation of a hostile work environment and retaliation under Title VII and the ELCRA, intentional infliction of emotional distress, and negligent infliction of emotional distress.  (ECF No. 1).  In response to Defendants' motion for summary judgment, however, Graham agreed to waive these claims.  (ECF No. 35).  Thus, the only claims before this Court are Graham's federal and state law claims for race and sex discrimination, and her state law claim for age discrimination.

as to her discrimination claims, Defendants are entitled to summary judgment.

### B.      Standard of Review

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558

(quoting *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989)).   Indeed,

"'[t]he failure to present any evidence to counter a well-supported motion for summary

judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d

484, 496 (6th Cir. 2009)).   "Conclusory statements unadorned with supporting facts are

insufficient to establish a factual dispute that will defeat summary judgment."   *Id.* at 560

(citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)).

## C.   Analysis

Graham alleges that Defendants discriminated against her in terminating her

employment with the City on the basis of her race, sex, and age.   A plaintiff may prove

discrimination through either direct or circumstantial evidence.   *See Geiger v. Tower Auto.*,

579 F.3d 614, 620 (6th Cir. 2009); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642,

648-49 (6th Cir. 2012).   "Direct evidence of discrimination is that evidence which, if

believed, requires the conclusion that unlawful discrimination was at least a motivating

factor in the employer's actions."   *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.*, 317

F.3d 564, 570 (6th Cir. 2003)).   Circumstantial evidence is "proof that does not on its face

establish discriminatory animus, but does allow a factfinder to draw a reasonable inference

that discrimination occurred."   *Id.* (quotations omitted).   Where, as here, a plaintiff does

not purport to have direct evidence of discrimination, but instead is relying on

circumstantial evidence, she must proceed under the burden-shifting framework set forth

in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).   This same framework applies

to employment discrimination claims brought under both Title VII and the ELCRA.   *See*

*Vaughn v. Dawn Food Prod., Inc.*, No. 2:18-CV-11491, 2020 WL 5017533, at *4 (E.D.

Mich. Aug. 25, 2020) ("Under both Title VII and the ELCRA, it is well established that Plaintiff may prove racial discrimination with circumstantial evidence under the *McDonnell–Douglas* burden-shifting framework." (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) and *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) ("Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases.")).

Under the *McDonnell Douglas* framework, Graham must first establish a *prima facie* case of discrimination by showing that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than a similarly situated, non-protected employee.[7] *See Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006). Then, the burden shifts to Defendants to articulate a legitimate,

---

[7] Defendants do not dispute that Graham is a member of a protected class; that she suffered an adverse employment action; and that she was qualified for the Project Manager position. (ECF No. 33, PageID.195-96). Rather, Defendants argue that Graham cannot establish the fourth prong of a *prima facie* case because she cannot show that she was "treated less favorably then [sic] similarly situated employees outside of the protected class or that she was replaced by a person outside of the protected class." (*Id.*, PageID.195). In articulating this argument, Defendants note that Sovereign hired Brad Wintersteen, a Caucasian male, to fill one of two vacant Project Manager positions in April or May of 2017, *before* Graham's employment was terminated on July 5, 2017. (*Id.*, PageID.195-96). According to Defendants, then, Wintersteen did not "replace" Graham because he was hired to fill a pre-existing vacancy. (*Id.*). While there is some facial appeal to Defendants' argument, *see Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) ("[a] 'person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.'") (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)), the Court ultimately need not resolve this issue because it finds that Graham's discrimination claims fail for other reasons. Thus, for purposes of the instant motion, the Court will assume Graham has made out the requirements of a *prima facie* case.

nondiscriminatory reason for Graham's termination.  *Id*.  If Defendants do so, to survive

summary judgment, Graham must identify evidence from which a reasonable jury could

conclude that the proffered reason is actually a pretext for unlawful discrimination.  *Id*.

"Although the burdens of production shift, [t]he ultimate burden of persuading the trier of

fact that the defendant intentionally discriminated against the plaintiff remains at all times

with the plaintiff."  *Davidson v. Allsteel, Inc.*, No. 09-11308, 2011 WL 717524, at *10

(E.D. Mich. Feb. 22, 2011) (quotations omitted).

> *1.    Defendants' Legitimate, Non-Discriminatory*
> *Reason for Terminating Graham's Employment*

As set forth above, *supra* at 14, n.7, the Court will assume that Graham has

established a *prima facie* case of unlawful discrimination; as a result, the burden shifts to

Defendants to articulate a legitimate, nondiscriminatory reason for the termination of her

employment.  *See Wright*, 455 F.3d at 707.  Here, Defendants assert that Graham was

terminated due to ongoing performance problems.   It is undisputed that issues with

Graham's job performance were first documented during her initial six-month probationary

period, and while Graham disagrees with Sovereign's assessment that she was performing

poorly, she admits that Sovereign voiced concerns about her performance on more than

one occasion. (ECF No. 33-7, PageID.424-27).  The job description for Graham's Project

Manager position specifically indicated that it was an "advanced level professional"

position that required only "nominal direction and supervision."  (ECF No. 33-5,

PageID.375).  Sovereign testified that, in the end, she simply could not sustain doing both

her job and Graham's, concluding: "Unfortunately, the projects our team are required to

lead are complex, large scale projects and at this point we do not feel confident that [Graham] could independently lead such projects." (ECF No. 33-12, PageID.637; ECF No. 33-3, PageID.327). Sovereign's specific reasons for finding Graham's work unsatisfactory – all of which were, at least facially, legitimate non-discriminatory reasons – were detailed in the second written probation evaluation. (*See supra* at 8-11; ECF No. 33-12, PageID.628). Because Defendants clearly articulated a legitimate non-discriminatory reason for terminating Graham's employment, the burden shifts to Graham to identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *See Wright*, 455 F.3d at 707.

> 2. *Graham Has Failed to Raise a Genuine Issue of Material Fact that Defendants' Proffered Reason for Her Termination was Pretextual*

Graham may establish pretext by showing (1) that the proffered reasons had no basis in fact, such as reasons that are "purely concocted and conflict with the facts in the record"; (2) that the proffered reasons did not actually motivate her discharge, "as when an employer cites a facially valid reason as a mere coverup for its true discriminatory motives"; or (3) that the proffered reasons were insufficient to motivate discharge. *See Miles v. South Central Human Res. Agency, Inc.*, 946 F.3d 883, 888 (6th Cir. 2020); *Harris v. City of Akron, Ohio*, 836 F. App'x 415, 420 (6th Cir. 2020). This three-part test need not be applied rigidly, as pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? *See Miles*, 946 F.3d at 888. Here, Defendants argue that Graham cannot establish pretext under any of the prongs listed above. (ECF No. 33, PageID.201-03). For the reasons set forth below, the Court agrees.

###### a.   Proffered Reason Had No Basis in Fact

To show pretext on the ground that the stated reason for termination had no basis in fact, a plaintiff "must provide evidence that the employer's allegations never happened." *Miles*, 946 F.3d at 888-89.  In this analysis, "the question is always whether the employer made up its stated reason to conceal intentional discrimination."  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009).

Here, Graham asserts that her "performance was not deficient," as evidenced by the overall positive nature of the initial performance evaluation she received after her first six-month probationary period, as well as the fact that Defendants "intentionally allowed [her] to continue to perform until [her] (younger, Caucasian and male) replacement was ready and able to take over [her] job."  (ECF No. 35, PageID.785, 786).  These arguments lack merit.

As an initial matter, Graham ignores the negative feedback provided in her first probationary evaluation, wherein Sovereign made clear that she had serious concerns about Graham's performance in her new role.  Although that evaluation was satisfactory overall, it contains examples of Graham's substandard performance in certain areas.  (ECF No. 33-10).  For example, Sovereign rated Graham as "Needs Improvement" in the areas of Business Writing (an "extremely critical" area for Project Managers) and Technical Knowledge.  (*Id.*, PageID.627; ECF No. 33-3, PageID.345).  Sovereign further indicated that specific areas of focus for improvement included Project Management, Meeting Facilitation, Meeting Planning/Effectiveness, Change Management, Project Documentation, and Project Plans.  (ECF No. 33-10, PageID.628).  Moreover, Sovereign

testified that Graham was having "a lot of challenges" during her first six months as a Project Manager, but she (Sovereign) wanted to use the evaluation to encourage Graham and "raise her up[.]"  (ECF No. 33-3, PageID.286, 314).  Indeed, the fact that Graham's probationary period was extended for an additional six months – and she was not simply granted permanent status – belies Graham's argument that she was not having performance problems.  Accordingly, even viewing the evidence in the light most favorable to Graham, there is no dispute that Sovereign expressed the aforementioned concerns about Graham's performance during her initial probationary evaluation and that, as a result, Graham's probation was extended.

Graham's second probationary evaluation provided additional, detailed examples of ongoing performance problems that occurred after February 1, 2017.  (ECF No. 33-12).  As discussed above, these problems included failures in the areas of Initiative & Self-Management, Business Writing, Technology Application, Critical & Analytic Thinking, and Technical Knowledge.  (*Id.*).  In each instance, Sovereign gave specific examples of the problems resulting in the negative evaluation.  Graham fails to mount any meaningful evidentiary challenge to Sovereign's evaluation, which she needed to do to establish that the reason articulated by Defendants for her termination had no basis in fact.

From an evidentiary perspective, Graham relies almost exclusively on the deposition testimony of Robert Millender, which she contends "alone creates a huge genuine issue of material fact that renders Summary Judgment inappropriate here[,]" as Millender indicated that he "was satisfied with the work that [] Graham performed on the ASE Project[.]"  (ECF No. 35, PageID.779, 786).  But such testimony is insufficient to

raise a material question of fact about Defendants' legitimate, nondiscriminatory reason for terminating Graham's employment for multiple reasons. First, the fact that *Millender* may have been satisfied with Graham's performance says nothing about *Sovereign's* satisfaction with Graham's performance in connection with the various specific issues noted in Graham's July 2017 probation evaluation. *See supra* at 8-11. Indeed, Millender testified that he wasn't Graham's direct supervisor, and that outside of the ASE Project, he had "no knowledge" of her work product. (ECF No. 35, PageID.811). Second, Millender corroborated the testimony of both Homant and Sovereign that Homant had expressed concerns about Graham not properly updating a Smartsheet, which was one of the specific issues Sovereign identified in Graham's July 2017 probation evaluation. (*See supra* at 8-11; ECF No. 35, PageID.811-12). In short, the fact that *Millender* – who was not Graham's supervisor – might not have had problems with her work performance does not establish that the reasons articulated by *Sovereign* for terminating Graham's employment were pretextual. *See, e.g., Carpenter v. Renfro Valley, LLC*, No. 12-82-GFVT, 2015 WL 893582, at *7 (E.D. Ky. Mar. 2, 2015) (rejecting plaintiff's argument that the reasons articulated for the termination of her employment – namely, poor job performance, work ethic, and skill – had no basis in fact even though she was never reprimanded for unsatisfactory work and her direct supervisor considered her work "exemplary").

For all of these reasons, Graham cannot succeed under the first *Miles* prong for establishing pretext.

### b.    *Proffered Reason Did Not Actually Motivate Discharge*

"[T]he second type of rebuttal of pretext – that a defendant's proffered reasons did

19

not actually motivate its action – 'is of an entirely different ilk' than the other types."

*Lawroski v. Nationwide Mut. Ins. Co.*, 570 F. App'x 589, 595 (6th Cir. 2014) (quoting

*Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 396 (6th Cir. 2008)).  As the *Lawroski* court

explained:

> Any endeavor to establish this type of rebuttal is based upon an admission of the factual basis underlying the employer's proffered explanation and further [admission] that [those facts] *could* motivate the adverse employment action.  To attempt to indict the credibility of the employer's explanation, the plaintiff normally offers circumstantial evidence that tend[s] to prove that an illegal motivation was *more* likely than that offered by the defendant.

*Id.* (emphasis in original) (quotations and citations omitted).  In other words, to establish

pretext using the second type of rebuttal evidence, Graham must concede that she was

having performance problems that could have motivated her discharge, but she must show

that illegal discrimination was the more likely reason for her termination.

In an effort to discredit the reason advanced by Defendants for terminating her

employment, Graham points to several pieces of circumstantial evidence that she claims

suggest Defendants were motivated by illegal animus.  For example, Graham asserts that

there was nothing in her initial performance review suggesting that she was about to be

fired.  Indeed, she claims it defies logic to believe that, within a period of about five months,

she went from exceeding or meeting expectations in thirteen of the fifteen categories rated

on her initial probationary evaluation, to becoming so incompetent as to warrant her

termination.  Graham also takes issue with the fact that she was not given the benefit of the

entirety of the second probationary period, suggesting that Defendants did not give her a

full and fair opportunity to improve her job performance.  Additionally, Graham takes issue

with Homant's purported involvement in the decision to terminate her employment, claiming that at the same time he failed to provide her with direct feedback, telling her to "talk to Robert [Millender]" when she approached him with questions, he was complaining to Sovereign about her performance deficiencies.  And, finally, Graham takes issue with Sovereign's notes regarding her performance problems, claiming that some of the entries were made *after* Sovereign made the decision, on May 31, 2017, to terminate her employment, thus establishing that they were not "contemporaneously maintained" and were made "due to [Graham's] pursuit of her legal claims."  (ECF No. 35, PageID.774-75).

The problem for Graham, however, is that none of these facts – even taken as true – raise a material question about whether Defendants' stated reason for her termination was a pretext for illegal discrimination.  While Graham claims she had no reason to believe, based on her initial six-month probationary evaluation, that termination was a possibility, it is undisputed that (1) Graham's first probation evaluation advised her of specific areas where improvement was necessary, and (2) her probationary period was *extended*, and she was *not* granted permanent status.  (ECF No. 33-10).  This plainly demonstrates that, at least in Sovereign's eyes, Graham's performance was not fully satisfactory.  Moreover, it makes little sense that Sovereign's decision *not* to fire Graham after this initial six-month period – but to instead give her significant additional time to improve her job performance – is evidence of discriminatory animus.  Indeed, at her deposition, Graham testified that

*Sovereign* did *not* discriminate against her,[8] saying that the alleged discrimination was "strictly from Mike Homant," though Graham later clarified her belief that Sovereign was implementing *Homant's* discriminatory decision. (ECF No. 33-7, PageID.520-23).

But pointing the finger at Homant gets Graham no traction in creating a material question of fact. Even if Graham could show that Homant played some role in the decision to terminate her employment – which she admits she cannot (*id.*, PageID.464) – there is no cognizable direct or circumstantial evidence in the record suggesting that Homant was biased against Graham because of her race, sex, or age. When Graham was asked at her deposition to explain her contention that Homant discriminated against her, she said, "[w]hen someone says something to you, you can almost feel it coming out of them when you know that [they're] a racist or you feel like he's being racist or you can feel it . . . I don't think it was just a feeling. It was the way he looked at me."[9] (*Id.*, PageID.515-16). This type of subjective belief, however, is insufficient as a matter of law to establish

---

[8] Other record evidence similarly belies any assertion that Sovereign was motivated by ill will or animus against Graham. For example, it is undisputed that Sovereign affirmatively sought to determine whether Graham could be transferred to her prior position (or another position), and Graham testified that Sovereign allowed her to obtain a certification she was working toward before terminating her employment "so it would be easier for [Graham] to find a job." (ECF No. 33-7, PageID.439; ECF No. 33-16, PageID.730).

[9] In her response to Defendants' motion for summary judgment, Graham attempts to proceed under the "cat's paw" theory of discrimination. (ECF No. 35, PageID.787-88). "The customary application of this theory involves a supervisor who 'performs an act motivated by [prohibited] animus that is intended by the supervisor to cause [the formal decisionmaker to take] an adverse employment action.'" *Flowers v. Wetrock Svcs., Inc.*, 979 F.3d 1127, 1134 (6th Cir. 2020) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 [] (2011)). Where a supervisor engages in such conduct, and where the supervisor's "act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* Even under this theory, however, Graham comes up short. Assuming that Sovereign is the cover for Homant, Graham has pointed to no *evidence* that Homant was biased against her because of her race, sex, or age.

22

pretext.  *See Smith v. City of Toledo, Ohio*, 13 F. 4th 508, 519 (6th Cir. 2021) (conclusory allegations and subjective beliefs are not enough to establish pretext); *Rosenthal v. Faygo Beverages, Inc.*, 701 F. App'x 472, 480 (6th Cir. 2017) (holding that district court "properly concluded that a plaintiff's subjective interpretations or feelings are insufficient to establish pretext").

Finally, the Court notes that the e-mail chain about the improperly-scheduled radio tower installations, which ended with Sovereign writing, "Karen, This is getting really embarrassing," *see supra* at 7 n.4, took place *prior* to the May 31, 2017 date when Sovereign decided Graham would not be retained.  The Court need not rely on later incidents, regardless of their contemporaneous recording in Sovereign's notes, in determining whether Graham has met her burden at this stage of the analysis.

Relatedly, two inferences weigh in Defendants' favor when considering whether Graham demonstrated that the proffered reason for her termination did not actually motivate Defendants' action.  First, Defendants are protected by the "honest belief" rule. "Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.  An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (internal quotations omitted).  As this Court has recognized:

> To determine whether Defendant had an honest belief [in its reason

23

> for the plaintiff's termination], courts must look "to whether [Defendant] can establish its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Braithwaite v. Timken Co.*¸258 F.3d 488, 494 (6th Cir. 2001). In this regard, the decisional process used by the employer need not be optimal or leave "no stone unturned." *Smith v. Chrysler Corp.*, 155 F.3d at 807. "Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

*Dyer v. Wal-Mart Stores, Inc.*, No. 16-12496, 2017 WL 2213570, at *5 (E.D. Mich. May 19, 2017); *see also Wright*, 455 F.3d at 707-08 (explaining the modified honest-belief rule as, "so long as the employer honestly believed in the proffered reason, an employee cannot prove pretext even if the employer's reason in the end is shown to be mistaken, foolish, trivial, or baseless," provided the employer can "establish its reasonable reliance on the particularized facts that were before it at the time the decision was made") (internal quotation marks and citations omitted).

In this case, there were reported and documented concerns with Graham's performance as a Project Manager from the start, which are reflected in the February 2017 probation evaluation. Sovereign discussed those issues again in the July 2017 probation evaluation, giving even more concrete examples, at least one of which related to the radio tower installation issue from shortly before the May 31, 2017 termination decision was made. All of this establishes that, right or wrong, Sovereign relied on "particularized facts that were before [her] at the time the decision was made" to terminate Graham, and is not now asserting new, non-contemporaneous facts to bolster the termination decision. *Majewski*, 274 F.3d at 1117. Graham's own subjective perception of her performance simply "does not raise a material issue of fact on the question of the quality of [her] work

merely by challenging the judgment of [her] supervisors." *Meadows v. Ford Motor Co.*, 21 F. App'x 302, 304 (6th Cir. 2001).

Moreover, Defendants are entitled to application of the "same actor" inference because Sovereign both hired and terminated Graham within a relatively short period of time. As explained in *Davidson*, 2011 WL 717524, at *14:

> Also significant in assessing this third stage of the *McDonnell-Douglas* framework is consideration of any inference to be drawn from the fact that the same individual both hired and fired the plaintiff. "The relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes at the third stage of the analysis. To reiterate in only slightly different terms what has previously been discussed, this fact creates a strong inference that the employer's stated reason for acting against the employee is not pretextual." *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir.1991).

*Davidson*, 2011 WL 717524, at *14; *see also Garrett v. Southwestern Med. Clinic*, 631 F. App'x 351, 357 (6th Cir. 2015) (under the "same actor inference," when the same person who hired plaintiff also fired plaintiff, there is a presumption that an employee's protected characteristic did not motivate the termination). Thus, where Sovereign hired Graham as a Project Manager, and terminated her employment less than one year later, the same actor inference weighs in Defendants' favor.

For all of the above reasons, Graham failed to raise a material question of fact as to whether Defendants' stated reason for her termination had no basis in fact.

### c.   *Proffered Reason Insufficient to Motivate Discharge*

Finally, Graham fails to raise a material question of fact that the proffered reason for her termination is insufficient to have motivated Defendants to discharge her. This type of argument is ordinarily proven with evidence that a similarly situated employee was

treated more favorably for the same conduct that resulted in the adverse action against the plaintiff. *See Manzer*, 29 F.3d at 1084. It is Graham's burden to establish that a similarly situated employee was treated differently than she was. *See Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357 (6th Cir. 2006). "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the relevant aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008). To be "similarly situated," employees generally must "'have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). A plaintiff fails to meet her burden if she offers no "evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to which the employer contends motivated its discharge of the plaintiff." *Manzer*, 29 F.3d at 1084.

Here, Graham has not identified any other employee who had performance issues similar to hers, and who was treated more favorably. As such, Graham failed to raise a material question of fact that the proffered reason for her termination is insufficient to have motivated Defendants to discharge her.

For all of the foregoing reasons, Graham failed to raise a material question of fact that the proffered reason for her termination was actually a pretext for unlawful discrimination. Accordingly, Defendants are entitled to summary judgment on Graham's Title VII and ELCRA discrimination claims.

**D.     Conclusion**

For the reasons set forth above, **IT IS ORDERED** that Defendants' Motion for Summary Judgment **(ECF No. 33)** is **GRANTED**.


Dated: March 23, 2022                          s/David R. Grand
Ann Arbor, Michigan                            DAVID R. GRAND
                                               United States Magistrate Judge


## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 23, 2022.

                                               s/Eddrey O. Butts
                                               EDDREY O. BUTTS
                                               Case Manager